# Staunton

## PLEZ SALYER v. CLINCHFIELD COAL CORPORATION.

September 6, 1950.

Record No. 3692.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*H. M. Bandy, Jr.*, for the appellant.

*Burns & Lively* and *William A. Stuart,* for the appellee.

MILLER, J., delivered the opinion of the court.

On January 21, 1949, Plez Salyer, appellant, hereinafter called claimant, filed an application before the Industrial Commission of Virginia asserting that he was entitled to compensation from Clinchfield Coal Corporation, appellee, due to disability caused by silicosis, an occupational disease contracted by him while in its employ. From an award of the Commission which denied compensation, this appeal was granted.

The evidence discloses that until he became partially disabled and ceased work on October 13, 1948, claimant had been in the continuous employ of appellee, working in its coal mines for thirty-four years. During that time, he was exposed to silica dust and it is conceded that the disease "arose out of and in the course of his employment."

In the year 1941, at the request of appellee, its employees had X-ray pictures of their chests taken by the State Board of Health. Reports upon what the respective pictures disclosed were made to the employer. Plez Salyer's report disclosed that he then had "late first or early second stage silicosis." However, neither the State Board of Health nor appellee advised him of the nature of the report, nor did he make any inquiry to ascertain what it disclosed. It was placed in the files of the Clinchfield Hospital at Dante, Virginia, and so far as revealed by this record, remained there until this litigation arose. After that X-ray examination, claimant resumed his regular work, where he continued to be exposed to silica dust as he had been in the past.

During May or June 1948, claimant, of his own volition, had another X-ray picture made of his chest. On April 6, 1949, when testifying in regard to that examination, he said, "I went there and had it made—They took the picture and that was all there was to it." In August, 1948, he again at his own instance attended a State Board of Health Clinic,

and had a further X-ray picture taken. He testified that he never received or ascertained the results of either of those examinations.

On October 13, 1948, he suffered some ill effects from the disease. He described his condition at that time as—"I worked that night and got—took up smothering and had to quit work." That is the last time that he worked. He said that the next day he gave his notice to appellee and sought the services of Dr. Elliott, its physician. On that day, *i. e.*, October 14, 1948, the physician was away and no examination was made by him of claimant until October 28, 1948. The history then given by claimant was that "of having had shortness of breath some time, probably a year, or something like that." The examination disclosed that the disease had advanced to a partial disability stage and claimant was so advised by the physician and told not to work "under unfavorable conditions."

On December 9, 1948, he was examined by Dr. S. G. Davidson, a recognized expert in silicosis diagnosis. Claimant, in the history then given, said that "he had pain in the chest and shortness of breath of one year's duration." His usual weight, he said, had been one hundred and sixty-five pounds, but it was then one hundred and forty-three pounds, and the period in which he had experienced loss of weight had been for one year. Dr. Davidson reported that claimant then had "a late second or an early third stage silicosis," with fifteen per cent disability due to the disease.

In his testimony, claimant said that he first knew that he had silicosis when Dr. Elliott examined him on October 28, 1948, and advised him of the fact. Though he admitted that he had suffered from shortness of breath and had some pain in his chest for about a year prior to that examination, he said these symptoms "didn't bother" him much. On cross-examination, he also admitted that at the time he went to Dr. Davidson for examination in December, 1948, he had lost weight and suffered from pain in the chest and shortness of breath for a year.

Summarized, the evidence definitely discloses that in 1941 claimant had contracted and was suffering from silicosis, though unknown to him. It had, at that date, reached the late first or early second stage. From Dr. Davidson's report, it appears that by December 9, 1948, the disease had progressed to late second or early third stage. In addition, it is shown that claimant had for a year or more prior to December, 1948, experienced and suffered definite silicosis symptoms, and because of that or for some unknown reason, had obtained two other X-ray examinations during the summer of 1948.

It is known and universally acknowledged that the development of silicosis is imperceptible, insidious, gradual and slow. Three stages of the disease are recognized by medical and legal authorities. Certain symptoms are usually evident and attendant during these respective stages of the malady.

In *Pocahontas Corp.* v. *Richardson*, 186 Va. 367, 42 S. E. (2d) 260, Mr. Justice Hudgins, now Chief Justice, said:

"According to the medical authorities, the disease is divided into first, second and third stages. * * *

"The symptoms of the second stage are usually as follows: 'A definite shortness of breath on exertion is usually found, and pains in the chest are a frequent complaint * * * even then the man's appearance may be healthy, but he is dyspnoeic on exertion, he cannot work as well as formerly, his chest expansion is noticeably decreased, the movement being sluggish and diminished in elasticity * * * .' "

It having been shown by the X-ray taken in 1941 that claimant was then definitely approaching, if not actually in, the early second stage, and his exposure to silica dust having thereafter continued, it would be reasonable to conclude, without further evidence, that by the year 1948, the disease would have advanced to full second stage, if not further. But ample proof of that fact is at hand, for from the symptoms recited and the conclusion reached in Dr. Davidson's report, it is quite apparent that the ravages of the

disease had slowly but steadily advanced to the second stage by the year 1948.

Whether under these facts claimant is entitled to compensation requires construction and interpretation of certain sections of the Workmen's Compensation Act as it existed in the year 1944, and as amended by Acts of 1948, ch. 243, p. 479. Prior to July 1, 1944, disability due to occupational diseases was not compensable. By Acts of 1944, ch. 77, p. 99, which became effective July 1, 1944, occupational diseases were defined and silicosis was expressly included and made compensable. However, by section 2-i of the Act, a pre-existing disease of that character was expressly excluded from its terms and recovery of compensation therefor forbidden. That section reads:

"Pre-existing Occupational Disease—An occupational disease which an employee has on the effective date of the amendments of this law shall not be covered hereunder. An employee has an occupational disease within the meaning of this law if the disease or condition has developed to such an extent that it can be diagnosed as an occupational disease. In every hearing before the Industrial Commission in this regard under this law, the burden shall be on the employee to prove that he did not have as of the effective date hereof the occupational disease for which he is seeking compensation." (Acts, 1944, p. 101).

As the diagnosis made in 1941 established that claimant was then suffering from silicosis, it is evident that he was by section 2-i excluded from the benefits of the 1944 Act. So long as that section remained in force, he had and could obtain no cause of action.

By an amendment which took effect on July 1, 1948 (Acts, 1948, ch. 244, p. 480), the scope of the statute was enlarged and additional occupational diseases brought within its terms. The more inclusive term of "pneumoconiosis" was substituted for silicosis. Section 2-i, which had excluded from its benefits all employees suffering from a pre-existing occupational disease on July 1, 1944, was repealed

(Acts 1948, ch. 243, p. 479), and sections 2-l and 2-m, having to do respectively with the time within which written notice of claim must be given the employer and claim filed with the Industrial Commission, were amended and reenacted. As then reenacted, they read:

Section 2-l. "Notice to be given.—Within thirty days after claimant first experiences a distinct manifestation, or a diagnosis is made, whichever shall first occur, of an occupational disease, the employee, or some one on his behalf, shall give written notice thereof to the employer in accordance with sections twenty-three and twenty-four of this act." (Sec. 65-48, Code, 1950.)

Section 2-m. "Limitation upon claim.—The right to compensation under these amendments shall be forever barred unless a claim be filed with the Industrial Commission within one year after claimant first experiences a distinct manifestation, or a diagnosis is made, whichever shall first ocur, of an occupational disease; and, if death results from the occupational disease, unless a claim therefor be filed with the Commission within one year thereafter." (Sec. 65-49, Code, 1950.)

It thus appears that prior to the repeal of section 2-i, which was effected by Acts, 1948, p. 279, claimant had been wholly excluded from the benefits of the statute. He had and could acquire no rights whatever thereunder, and until July 1, 1948, enjoyed no protection for disability caused by an occupational disease. Though he was by the repeal of section 2-i, brought thereafter within its coverage, his rights were made subject to certain terms, conditions and limitations, set out in sections 2-l and 2-m. These are—(1) that written notice be given the employer by him or some one on his behalf, within thirty days after he experiences a distinct manifestation, or a diagnosis is made, of the disease, whichever shall first occur, and (2) that claim be filed within one year after he first experiences such distinct manifestation or diagnosis be made.

These steps upon which his right to recover are

dependent must be taken within the times prescribed. Nor is certainty or actual knowledge on the part of an employee that he is in fact afflicted with an occupational disease necessary to impose upon him the obligation of giving notice and filing claim within the respective periods specified.

■ In our opinion the employee has experienced a distinct manifestation of the disease if his affliction has so far progressed that he undergoes, has or suffers a sufficiently clear or pronounced symptom or symptoms of the malady as would apprise a reasonably prudent man of the fact that he was probably in need of medical examination or assistance.

"Disability from a disease has been defined as the stage when the disease prevents the employee from performing his work efficiently." Schneider's Workman's Compensation Text, sec. 932, p. 514.

■ Though incapacity to work or death of the employee has been fixed by the present Virginia Act as the accrual time of his right of action, sec. 65-46, Code, 1950, there need not be disability at the time notice is required to be given under the 1948 Act, which first extended to claimant the benefits of the law, for diagnosis or experience of a distinct manifestation of the disease is expressly fixed as the period from which limitation begins to run.

■ In our opinion, the evidence conclusively establishes that claimant experienced distinct manifestations of the disease long prior to July 1, 1948. By his own admission, he had lost weight and suffered from shortness of breath and pains in his chest for a year or more prior to December 9, 1948. In fact, the disease had reached its full second stage during that year and definite symptoms of the malady were experienced and clearly evident by December, 1947.

July 1, 1948, being the effective date of the Act under which he asserts his right to compensation, it is evident that it was necessary that he give the written notice to his employer as required by section 2-1 within thirty days subsequent to that date and file claim within one year. But to escape the clear and disastrous effect of failure to give such

notice, he relies upon the diagnosis and report made in 1941 by the State Board of Health, which appears to have thereafter reposed in the hospital files, unthought of for seven years or more, and until institution of this litigation.

It is to be remembered that there was no duty upon appellee to make the X-ray picture. However, its result could have been ascertained by claimant, but he was not sufficiently concerned to make inquiry as to what it disclosed for then there was no law allowing compensation for an occupational disease, and the act under which he now claims did not become effective until July 1, 1948. Under these facts we cannot presume or conclude that it was the intent of the legislature that a diagnosis thus made many years previous to the effective date of any act allowing compensation to any class of occupationally diseased employees should be construed as fulfilling the requirement of section 2-l. Certainly not as respects this claimant who had no rights at all until July 1, 1948. To decide otherwise would extend and enlarge the statute and give to it a retroactive effect not justified or contemplated by its terms.

However, if the strained construction in that respect contended for by claimant be placed upon the statute, and the diagnosis of 1941 be construed as constructive notice to appellee, thus relieving him from giving the written notice in accordance with the plain mandate of the statute, the result reached is nevertheless the same. By the distinct terms of section 2-m, claim is required to be filed within one year after diagnosis. This was obviously impossible, or more accurately speaking, it would have been futile for no cause of action existed in claimant until years after the 1941 diagnosis was made. Yet, if receipt of the diagnosis be deemed notice to the employer, then by the same token it was required that claim be filed by the employee within a year after it was made.

This incongruous result makes it quite evident that no such notice received by an employer or given by an employee prior to the effective date of the act was intended

by the legislature to constitute a compliance with the specific and mandatory procedural requirements of a law that did not become effective until years thereafter.

For the reasons stated, the order of the Industrial Commission should be affirmed.

*Affirmed.*

BUCHANAN, J., dissenting.

The court holds that the thirty days within which a claimant must give notice to his employer under section 2-1 of the 1948 act begins to run on the day when a reasonably prudent man would think that probably he ought to see a doctor. I am unable to agree with that interpretation and with the conclusion reached as the result of applying it to the facts of this case.

The statute provides that the notice shall be given within thirty days after the *claimant* (not the prudent man) "first experiences a distinct manifestation, or a diagnosis is made." I think this means that the manifestation must be distinct to the claimant, reasonably sufficient to cause him to believe that he had an occupational disease, considering his mental qualifications.

The change in the language of section 2-1 made by the 1948 amendment is significant. That section in the 1944 act required that "within thirty days after the first distinct manifestation of an occupational disease," written notice should be given to the employer. The 1948 amendment changed that language to read "within thirty days after claimant first experiences a distinct manifestation, or a diagnosis is made," the notice shall be given.

The word *distinct* means clear, plain, well defined; and the word *manifest* means evident to the senses. *Webster's New International Dictionary*, 2 ed., unabridged. A distinct manifestation of an occupational disease therefore denotes that its existence is clearly evident. The evidence of it should be clear to the claimant, not just to the prudent man.

The statute is for the aid of those who have an occupational disease, whether they be prudent or imprudent. The practice of men in regard to seeing a doctor when they experience pain or illness is highly variable and hardly permits the establishment of a prudent man rule. I think the statute fixes a more workable standard; i. e., the first appearance of symptoms that clearly should apprise the particular claimant, learned or unlearned, alert or dull, as the case may be, that he has an occupational disease. Since his right to compensation for a disease he has contracted in the course of his employment may depend upon positive action in a prescribed time, the beginning of that time should not be determined by a formula that may well result in taking away the protection of the statute from those it was designed to aid.

The majority of the Commission denied compensation on the ground that since the claimant had silicosis prior to the effective date of the occupational disease law, there could be no recovery. The court disagrees with that view and holds that by the 1948 repeal of section 2-i this claimant was thereafter brought within the coverage of the compensation law. I agree with that view but I do not think that the right thus given him has been lost by reason of the limitations in the 1948 amendments of section 2-l and 2-m.

Commissioner Martin, in a minority opinion, held that "the record shows that defendant has had actual knowledge of the fact that claimant had silicosis ever since 1941." That was when his chest was X-rayed by the State Health Department. Salyer testified without contradiction that this was done at the direction of Clinchfield and that all who worked were notified that "if they didn't have these pictures they didn't work." The report from that examination was that Salyer had late first or early second-stage silicosis. Dr. Elliott testified that "it was sent to doctor and kept in medical file at the Clinchfield Coal Corporation." The evidence is that Salyer never saw that report and knew nothing about what it contained. The fair inference is that since

the company had the examination made, it knew the result of it. It produced the report at the hearing.

Section 2-l provides for the giving of written notice "in accordance with sections twenty-three and twenty-four of this Act." Section 23 (Code, 1950, sec. 65-82) provides that such notice shall be given, unless it can be shown that the employer, his agent or representative, "had knowledge of the accident." Section 2-j (Code, 1950, sec. 65-46) provides that incapacity for work resulting from an occupational disease "shall be treated as the happening of an injury by accident."

By an examination directed by it the company learned in 1941 that this claimant had silicosis, and that information, in writing, was in its files thereafter during the years in which claimant continued to work, as defendant knew, in the dust that caused his disease. That, it seems to me, ought to be evidence of actual knowledge sufficient to prevent the rejection of his claim on the ground of failure to give written notice. *Department of Game, etc., Fisheries* v. *Joyce*, 147 Va. 89, 136 S. E. 651.

I would hold, also, that Salyer's claim is not barred by section 2-m (Code, 1950, sec. 65-49), providing that such claim shall be forever barred unless filed with the Industrial Commission within one year after the claimant first experiences a distinct manifestation, or diagnosis is made. The 1941 diagnosis, in possession of the defendant ever since, gave actual and continuous knowledge to it that Salyer had silicosis. It was not required, however, that within one year thereafter Salyer file his claim, for the simple reason that there was nothing to claim. He then had no right to compensation and such right was not available to him until the amendment of July 1, 1948. I think Commissioner Martin was correct in holding that "the reasonable construction of section 2-m is that the limitations imposed thereby begin to run from events occurring after the Occupational Disease Law becomes effective." While, as Commissioner Martin stated, the evidence establishes that the

claimant had some pain in his chest and shortness of breath as early as December, 1947, the record does not show that such symptoms were, or should have been, a distinct manifestation to Salyer that he had silicosis. As the court's opinion states, silicosis is an insidious disease, developing slowly and imperceptibly. The Chief Justice said in *Pocahontas Corp.* v. *Richardson*, 186 Va. 367, 371, 42 S. E. (2d) 260, 262:

"The disease may have developed to such an extent that it is susceptible of diagnosis by an experienced doctor with the aid of X-ray and yet the objective symptoms may be so slight that the victim may be entirely unconscious of having contracted the disease."

Many people have pains in the chest and shortness of breath who do not have silicosis. The record indicates that this claimant is an uneducated man of limited mentality. Even the physicians qualified to diagnose his disease are of limited number. Dr. Elliott only suspected he had silicosis when he first examined him in October, 1948. In my view, the earliest time Salyer might be charged with a distinct manifestation of the disease was when he twice voluntarily had himself examined in the summer of 1948, materially less than a year before he filed his claim. His testimony was that the first time he had any idea he had silicosis was when Dr. Elliott examined him in October, 1948, after he began to smother and had to quit work on the night of October 13.

On the facts shown in the record, I think Salyer is entitled to have the $5.93 a week allowed him by Commissioner Martin.